**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Nina Y. Wang**

Civil Action No. 22-cv-00658-NYW

B.J.B.,[1]

      Plaintiff,

v.

KILOLO KIJAKAZI, Acting Commissioner of the Social Security Administration,[2]

      Defendant.

---

**MEMORANDUM OPINION AND ORDER**

---

      Pending before the Court is Plaintiff B.J.B.'s ("Plaintiff") Complaint and Petition for Review filed on March 16, 2022.  [Doc. 1].  This matter arises under a Title XVI application for supplemental security income ("SSI"), originally filed with the Social Security Administration ("SSA") on June 7, 2019.  [Doc. 10-2 at 14].[3]  On August 5, 2022, Plaintiff submitted her Opening Brief.  [Doc. 16].  On September 30, 2022, Defendant Kilolo Kijakazi, Acting Commissioner of the SSA ("Defendant" or the "Commissioner"), submitted her Response Brief.  [Doc. 19].  On October 21, 2022, Plaintiff submitted her Reply Brief.  [Doc. 20].  The questions presented are

---

[1] The Local Rules for this District provide that "[a]n order resolving a social security appeal on the merits shall identify the plaintiffs by initials only."  D.C.COLO.LAPR 5.2(b).  Accordingly, this Court refers to Plaintiff using her initials only.

[2] On July 9, 2021, President Biden appointed Kilolo Kijakazi as Acting Commissioner of Social Security.  No further action is necessary to continue this suit pursuant to the Social Security Act, 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office."); Fed. R. Civ. P. 25(d).

[3] When citing to the Administrative Record, the Court utilizes the page number found in the bottom right-hand corner of the page.  For all other documents, the Court cites to the document and page number generated by the Electronic Case Filing ("ECF") system.

ripe for resolution, and the Court finds that they may be resolved without the need for oral argument. For the reasons set forth below, the Court **AFFIRMS** the Commissioner's final decision.

## BACKGROUND[4]

SSI is available to an individual who is financially eligible, files an application for SSI, and is disabled as defined in the Act. 42 U.S.C. § 1382. Plaintiff's application for SSI is predicated on a number of severe impairments: bilateral carpal tunnel syndrome, obesity, schizophrenia, a depressive, bipolar, or related disorder, a personality disorder, and post-traumatic stress disorder. [Doc. 10-2 at 14]. She has also been diagnosed with a number of non-severe impairments, including

> deep vein thrombosis of the distal vein of the left lower extremity, hyperparathyroidism status post parathyroidectomy, gastroesophageal reflux disease ("GERD"), hypertension, chronic kidney disease, mixed hyperlipidemia, dermatitis, candidal skin infection, insomnia, chronic renal impairment, type II diabetes mellitus, diabetic nephropathy, bronchitis, acute bacterial sinusitis, gastritis, kidney stone, cholelithiasis, dehydration, tendonitis, marijuana dependence, vitamin D deficiency, hypercalcemia, and onychomycosis.

[*Id.* at 15]. Attendant symptoms are numerous, and include

> anticoagulant long-term use, dysphagia, increased calcium in blood, adverse effect of drug, elevated blood pressure reading, acute left leg pain, proteinuria, marijuana use, amenorrhea, decreased libido, low back pain at multiple sites, nausea, prediabetes, numbness of upper extremity, parent-biological child conflict, trouble with current living situation, trouble in relationship with daughter, intractable vomiting, paresthesia of the bilateral upper extremities, pain of the bilateral upper extremities, bilateral hand numbness, contact/exposure with communicable disease, shortness of breath, elevated ALT measurement, low ferritin level, elevated liver enzymes, and hot flashes.

---

[4] These facts are drawn from the voluminous record in this case, *see generally* [Doc. 10], and do not capture the entirety of Plaintiff's medical history or every possible source for her claims. Rather, this section focuses on those portions of Plaintiff's medical history that are most relevant to this appeal.

[*Id.* at 14].  Plaintiff has not engaged in substantial gainful activity since June 7, 2019. [*Id.*].

With respect to alleged physical disabilities, in November 2018 Plaintiff treated in an emergency room for pain in her left wrist.  [Doc. 10-7 at 440].  In February 2019, she was diagnosed with primary hyperthyroidism; in light of "multiple indications for surgery," she had a parathyroidectomy on March 25, 2019.  [*Id.* at 423, 431].  Five days later, Plaintiff traveled to the emergency room because of tingling in her face and hands that she had been experiencing since her surgery.  [*Id.* at 409].  The numbness in her hands continued for approximately three months, [Doc. 10-8 at 818], and she repeated these concerns in November 2020 and March 2021, [Doc. 10-9 at 1063–64, 1076].  A March 2021 test suggested bilateral chronic mononeuropathies in both wrists.  [Doc. 10-8 at 991].  Nevertheless, Plaintiff also presented with normal sensation and normal muscle tone in other records.  [Doc. 10-7 at 707; Doc. 10-8 at 843, 846, 849, 852].

Plaintiff reports that she is unable to close her right hand, and that she experiences symptoms of carpal tunnel in her left hand.  [Doc. 10-2 at 44–45].  While she has expressed a desire for surgery to fix both wrists, she is concerned about COVID-19 in light of underlying kidney issues.  [*Id.* at 45].  In addition to her wrists and hands, she also noted a number of possible side effects from treatment for her kidney disease and other disorders; these included nausea, heartburn, and gastric inflammation.  *E.g.* [Doc. 10-7 at 656, 675; Doc. 10-9 at 1121].  In 2018, a treating physician prescribed Lisinopril to preserve residual kidney function.  [Doc. 10-7 at 656; Doc. 10-9 at 1124].  These disorders, medications, and symptoms aside, Plaintiff regularly denied neurological complaints and maintained normal muscle tone and strength.  *E.g.* [Doc. 10-9 at 889–92, 895, 898, 901, 904].

With respect to mental impairments, it appears that Plaintiff has been undergoing treatment for bipolar disorder, obsessive-compulsive disorder, and anxiety since approximately 2018.  [Doc.

10-7 at 873].  She was prescribed lamotrigine, olanzapine, Adderall, Abilify, Trileptal, Prozac, Celexa, Wellbutrin, Zoloft, Paxil, lithium, Xanax, and Seroquel, and was diagnosed with schizophrenia, biopolar affective, manic, and adult ADHD.  [Doc. 10-7 at 640; Doc. 10-8 at 817, 873–74; Doc. 10-9 at 1145].  These disorders allegedly cause her to become angry, and impair her ability to work with friends, family, and neighbors.  [Doc. 10-7 at 331, 336].  They have also allegedly impacted her ability to obtain full-time employment; her recent employment history consists of part-time work at various food service establishments.  [Doc. 10-2 at 41, 54].  Her last period of employment was in September 2018.  [*Id.* at 49].

In February 2019, Plaintiff reported experiencing panic attacks every other day.  [Doc. 10-8 at 873].  These attacks allegedly prevented her from leaving her home, as she was concerned by the prospect that others were talking about her and that she could be run over by a car.  [*Id.*].  She began treating with Dan Low ("Mr. Low"), a psychiatric mental health nurse practitioner, at around this point.  *See* [*id.*].  Mr. Low diagnosed Plaintiff with post-traumatic stress disorder and a personality disorder, and continued treatment with prescriptions of Seroquel, alprazolam, mixed amphetamine salts, hydroxyzine, Adderall, gabapentin, Haloperidol, and propranolol.  *E.g.* [*id.* at 804, 816, 875, 890, 900, 903, 1006, 1109, 1112].  At various points during her treatment, Plaintiff reported experiencing suicidal ideation.  *E.g.* [Doc. 10-2 at 42, 53].

She was involved in one physical altercation because of a disagreement with another customer at Walmart, and occasionally reported hearing voices.  [Doc. 10-8 at 1013].  Nevertheless, the frequency of her panic attacks has decreased from every other day to approximately five or six times per year.  [Doc. 10-2 at 38].  Laura Schwischer, PhD ("Dr. Schwischer"), a non-treating expert, offered that Plaintiff was unable to learn complex tasks or interact appropriately with coworkers or supervisors.  [Doc. 10-8 at 880].  However, Dr.

Schwischer also found that Plaintiff was able to understand, recall, and perform simple tasks.  [*Id.*].  She further reported that Plaintiff's psychological symptoms would not prevent her from working a forty-hour work week with occasional breaks.  [*Id.*].  At the hearing, a vocational expert opined that Plaintiff would be employable in roles that involved occasional interaction with coworkers.  [Doc. 10-2 at 63].  He clarified that regularly being off-task for more than 15% of a workday could lead to discharge, however, and that missing more than two or more days of work per month would also lead to limited employability.  [*Id.* at 64–68].

Plaintiff filed for SSI benefits on July 22, 2019.  [Doc. 10-5 at 257].  On September 20, 2021, Administrative Law Judge Matthew C. Kawalek (the "ALJ") held a hearing on Plaintiff's application.  [*Id.* at 30–68].  He denied the application in a decision dated October 4, 2021.  [*Id.* at 9–29].  The ALJ followed the five-step sequential evaluation process in determining whether Plaintiff was disabled under the Act.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity since June 7, 2019.  [*Id.* at 14]. At Step Two, the ALJ concluded that Plaintiff had several severe impairments: bilateral carpal tunnel syndrome, obesity, schizophrenia, a depressive, bipolar, or related disorder, a personality disorder, and post-traumatic stress disorder.  [*Id.*].  At Step Three, the ALJ reasoned that Plaintiff's symptoms did not meet or medically equal any Listing.  [*Id.* at 15].  He then concluded that Plaintiff was only able to perform a light range of work including certain limitations: that she could only occasionally crawl or climb, that she could only frequently handle, finger, feel, or operate hand controls with both hands, that she could complete only simple tasks involving simple instructions, that she could sustain only ordinary routines, that she could make no more than simple decisions, and that she could tolerate no more than occasional interaction with coworkers, supervisors, and the public.  [*Id.* at 17–18].  At Step Four, the ALJ concluded that

Plaintiff possessed no past relevant work history.  [*Id.* at 23].  Relying on a vocational expert, however, the ALJ concluded that Plaintiff could perform work that existed in significant numbers in the national economy (including as a production assembler, conveyor monitor, or laundry worker) at Step Five.  [*Id.*].  As such, he concluded that she was not disabled under the Act.  [*Id.* at 24].

The SSA's Appeals Council denied Plaintiff's request for reversal or remand of the ALJ's decision on January 18, 2022, thereby adopting the ALJ's decision as the Commissioner's final decision in this matter.  [*Id.* at 1–6].  Plaintiff timely filed her appeal in this Court on March 16, 2022.  *See* [Doc. 1].  The Court has thoroughly reviewed the facts presented in the Parties' briefs and in the Administrative Record, and now considers the legal standards that govern its resolution of this case.

## LEGAL STANDARD

### I.    Standard of Review

After the Commissioner issues a final decision, a claimant "may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision."  42 U.S.C. § 405(g).  This review is not expansive; indeed, "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive" and binding upon a district court.  *Id.*  This means that the Court will uphold the Commissioner's decisions where an ALJ has applied the correct legal standard in a decision "supported by substantial evidence."  *Hedstrom v. Sullivan*, 783 F. Supp. 553, 556 (D. Colo. 1992).  Failure to apply the correct legal standard "is a ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).  "Substantial evidence,"

in turn, need only constitute sufficient evidence "as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted).

Given the centrality of the ALJ's consideration of the evidence to the instant case, the Court must also analyze whether he considered all of the relevant evidence and adequately explained his rationale for crediting or discrediting it. *See Milburn Colliery Co. v. Hicks*, 138 F.3d 524, 528 (4th Cir. 1998). Where an ALJ fails to consider or adequately explain a relevant piece of evidence, a court may remand an appeal for further fact-finding or clarification. *See Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (noting that an ALJ's failure to explain evidence relevant to each factor in an appeal related to SSI benefits was grounds for remand). That said, while a reviewing court should—and will—meticulously examine the record, it may not reweigh the evidence or substitute its discretion for that of the Commissioner. *Thompson*, 987 F.2d at 1487.

## II. Evaluation Process

The Commissioner applies a five-step sequential evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). These include:

1. Whether the claimant has engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment or combination of impairments;

3. Whether the claimant has an impairment that meets or medically equals any listing found at Title 20, Chapter III, Part 404, Subpart P, Appendix 1;

4. Whether the claimant has the residual functional capacity ("RFC") to perform her past relevant work; and

5. Whether the claimant can perform work that exists in the national economy, considering the claimant's RFC, age, education, and work experience.

*See* 20 C.F.R. §§ 404.1520(a)(4)(i)–(v), 416.920(a)(4)(i)–(v); *see also Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir. 1988) (describing the five-step process).  "The claimant bears the burden of proof through" Step Four of the analysis, while the Commissioner bears the burden of proof at Step Five. *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (internal quotation marks omitted).

An individual is disabled for the purposes of the Act where her "physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 13382c(a)(3)(B).  The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214–15 (2002); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1509, 416.905.  When a claimant has one or more physical or mental impairments, the Commissioner must consider the combined effects in making a disability determination.  42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

In formulating a claimant's RFC, the ALJ must consider the combined effect of all the claimant's medically determinable impairments, including those that are severe and those that are non-severe. *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); *Ray v. Colvin*, 657 F. App'x 733, 734 (10th Cir. 2016).  A claimant's RFC is the most work the claimant can perform, not the least. *See* SSR 83-10, 1983 WL 31251, at *7 (Jan. 1, 1983).

"'The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical

evidence (e.g., daily activities, observations).'"  *Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014) (quoting SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996).  The ALJ is not tasked with identifying "specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before an ALJ can determine [a] RFC within that category," and as such the Court will uphold the RFC assessment if it is consistent with the record and supported by substantial evidence.  *See Howard v. Barnhart*, 379 F.3d 945, 947, 949 (10th Cir. 2004).  It is this legal framework that will govern the Court's resolution of the instant matter.

## ANALYSIS

Plaintiff advances three principal arguments for a favorable decision granting benefits to be paid, or for reversal and remand of the Commissioner's decision: (1) that the ALJ erred at Step Two of his decision in categorizing Plaintiff's kidney disease as non-severe and failing to consider nausea resulting from that condition in formulating her RFC, (2) that the ALJ erred in discounting Plaintiff's bilateral carpal tunnel syndrome at Step Five, and (3) that the ALJ erred in evaluating Plaintiff's mental impairments at Step Five.  *See generally* [Doc. 16].  The Court addresses each argument in turn.[5]

## I.      Categorization of Plaintiff's Kidney Disease at Step Two and Failure to Consider Resulting Nausea in Formulating RFC

Plaintiff contends that the ALJ erroneously categorized her kidney disease as non-severe at Step Two, and then failed to discuss her resulting nausea when formulating her RFC.  [Doc. 16 at 26–28].  The Commissioner counters by noting that it is irrelevant whether Plaintiff's kidney

---

[5] While the Parties' briefs end by addressing Plaintiff's argument regarding the ALJ's purported error at Step Two, the Court considers the arguments sequentially based on the five-step evaluation process.  Plaintiff's challenge to the ALJ's Step-Two findings is first sequentially in the framework, and so the Court considers it here.

disease was categorized as non-severe at Step Two, as the ALJ expressly noted that he considered non-severe impairments at Step Five.  [Doc. 19 at 17–19].

As an initial matter, the Court recognizes that "the failure to find a particular impairment severe at step two is not reversible error when the ALJ finds that at least one other impairment is severe."  *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016); *see also* 20 C.F.R. § 404.1520(a)(4)(ii) ("If you do not have *a* severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe . . . , we will find that you are not disabled." (emphasis added)).  In this case, the ALJ found six severe impairments: (1) bilateral carpal tunnel syndrome, (2) obesity, (3) schizophrenia, (4) a depressive, bipolar, or related disorder (called either mood disorder or bipolar effective disorder), (5) a personality disorder, and (6) post-traumatic stress disorder.  [Doc. 10-2 at 14].  As such, Defendant's categorization of Plaintiff's kidney disease as non-severe at Step Two does not constitute reversible error.

Nevertheless, the ALJ remains obligated to consider both severe and non-severe impairments in developing a given claimant's RFC.  20 C.F.R. § 404.1545(e) ("[W]e will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity.").  But while the record must show the ALJ considered all the evidence, he is not required to discuss every piece of it.  *Mays v. Colvin*, 739 F.3d 569, 576 (10th Cir. 2014).  Plaintiff argues that nausea resulted from her kidney condition (or the medicine used to treat it), and that the ALJ should have discussed it when determining her RFC.  [Doc. 16 at 25–26].  Defendant argues that the ALJ has done so here.  [Doc. 19 at 18–19].  For support, Defendant points to the ALJ's express note that Plaintiff was diagnosed "with a number of symptoms during the period under review," including "nausea."  [Doc. 10-2 at 14].  The ALJ further noted that, in making his RFC finding, he "considered *all* symptoms and the extent to which these symptoms

can reasonably be accepted as consistent with the objective medical evidence and other evidence." [*Id.* at 18 (emphasis added)]. He went on to reason that Plaintiff's testimony regarding the intensity, persistence, and limiting effect of certain symptoms were not consistent with the medical evidence and her stated ability to perform a number of basic daily tasks. [*Id.* at 18–19]. In formulating his RFC, he relied on the "record in its entirety," and reasoned that "[t]he residual functional capacity fully accounts for the claimant's impairments *and related symptoms*." [*Id.* at 22 (emphasis added)].

While this Court does not conclude that Plaintiff's argument is "unsupported" as Defendant suggests*, see* [Doc. 19 at 19], it nonetheless does not find a basis for reversal. The ALJ did not explicitly mention the consideration of nausea in his RFC analysis. Nevertheless, he did note "nausea" as a symptom at Step Two, and based his RFC determination on "*all* symptoms." [Doc. 10-2 at 18 (emphasis added)]. While a more fulsome discussion of Plaintiff's nausea may lend itself to more meaningful review, this Court's "general practice . . . is to take a lower tribunal at its word when it declares that it has considered a matter." *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005); *see also Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007) (accepting ALJ's statement "that he considered all of [a plaintiff's] symptoms" in assessing her RFC). That is particularly true in this case, where the ALJ included an extensive discussion of Plaintiff's medical history and hearing testimony in formulating his RFC (along with his method for doing so). *See* [Doc. 10-2 at 17–23]; *Schoengarth v. Colvin*, No. 13–cv–02996–CBS, 2015 WL 1742844, at *5 (D. Colo. Apr. 14, 2015) ("Here, the ALJ's decision contains a detailed discussion of much of the evidence that Plaintiff submitted, a discussion of how the ALJ weighed the evidence, and a thorough account of how the ALJ arrived at his conclusion . . . . Thus, the court takes the ALJ at his word that he considered all of the evidence, even those records that were not explicitly

discussed.   The ALJ's failure to recite and explicitly evaluate each piece of evidence was not error.").

Moreover, the Court finds persuasive the fact that Plaintiff has not identified any way in which her nausea *in particular* would (or should) affect the ALJ's RFC assessment.  *See Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005) (reasoning that a medical condition need not be considered where the claimant has failed to identify resulting functional limitations that would affect the ALJ's analysis); *c.f. Coleman v. Chater*, 58 F.3d 577, 579 (10th Cir. 1995) (reasoning that the "mere presence" of a medical condition is not enough to warrant reversal; rather, that the specific condition, "alone or in combination with other impairments, must render [the] claimant unable to engage in any substantial employment" (internal quotations marks omitted)).  Plaintiff notes that the nausea is a side effect of her medication and that "[h]er nausea is a functional limitation."  [Doc. 16 at 25–26].  But the ALJ's RFC determination is as follows:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a reduced range of light work as defined in 20 CFR [§] 416.967(b) in that the claimant can occasionally lift/carry 20 pounds and frequently lift/carry 10 pounds. She can stand and/or walk 6 hours and sit 6 hours of an 8-hour workday. The claimant can occasionally crawl or climb ladders, ropes, or scaffolds. She can frequently handle, finger, feel, or operate hand controls with the bilateral upper extremities. Mentally, she is limited to understanding, remembering, carrying out, and maintaining attention and concentration on no more than simple tasks and instructions, defined specifically as those job duties that can be learned in up to 30 days' time. She can sustain only ordinary routines and make no more than simple, work-related decisions. She can tolerate no more than occasional interaction with coworkers, supervisors, and the general public.

[Doc. 10-2 at 17–18].  It is unclear how nausea, in particular, would functionally limit this reduced range of light work, and Plaintiff does not attempt to explain as much.

In sum: Plaintiff has not demonstrated that the ALJ committed reversible error in failing to expressly discuss Plaintiff's reported nausea outside of Step Two.   The ALJ considered all

symptoms in making his RFC determination, and characterized nausea as such a symptom earlier in his decision.  Without anything more, remand is unwarranted.

## II.     Error in Discounting Plaintiff's Bilateral Carpal Tunnel Syndrome at Step Five

Plaintiff also argues that the ALJ erred at Step Five by discounting her bilateral carpal tunnel syndrome in his RFC determination.  [Doc. 16 at 19–22].  Initially, the Court clarifies that Plaintiff is not actually raising a "Step Five" issue here (despite her assertion that the ALJ's error occurred "at Step [Five]").  [Doc. 16 at 19].  Defendant correctly takes issue with this characterization, as—at Step Five—"a limited burden shifts to the Commissioner to show that there are jobs in the economy which are within the *RFC assessed between steps three and four of the sequential process*."  *Pemberton v. Colvin*, No. 14–2340–JWL, 2015 WL 4066737, at *2 (D. Kan. July 2, 2015) (citing *Williams*, 844 F.2d at 751 n.2); *see also Victoria v. Saul*, No. 1:20-cv-00029-DBP, 2020 WL 10355120, at *1 (D. Utah Dec. 17, 2020) (evaluating RFC determination between Steps Three and Four); *Oaks v. Saul*, No. 4:18-cv-00075-PK, 2019 WL 4110535, at *1 (D. Utah Aug. 29, 2019) (same).  This distinction is important, because—at all times through steps one through four of the sequential evaluation process—Plaintiff bears the burden of proof.  *Bowen v. Yuckert*, 482 U.S. 137, 138 n.5 (1987) ("But the Secretary is required to bear this burden [of proof] only if the sequential evaluation process proceeds to the fifth step.  The claimant first must bear the burden at step one of showing that he is not working, at step two that he has a medically severe impairment or combination of impairments, and at step four that the impairment prevents him from performing his past work.").  And this Court's review is not limitless, but rather "is bound by the findings of fact if they are supported by substantial evidence."  *Byron v. Heckler*, 742 F.2d 1232, 1234 (10th Cir. 1984).  Thus, if Plaintiff believes an ALJ's RFC assessment is not sufficiently restrictive, *she* bears the burden to demonstrate that Defendant's decision is not

supported by substantial evidence and point to record evidence to do so. *Edward E. v. Kijakazi*, No. 21-1203-JWL, 2022 WL 3368542, at *6 (D. Kan. Aug. 16, 2022).

As such, the Court begins with a review of the medical evidence and hearing testimony that the ALJ relied upon with respect to Plaintiff's carpal tunnel and her RFC.  He noted that carpal tunnel was the source of "isolated complaints without any significant complications," and that Plaintiff "was generally negative for symptoms in 2019 and most of 2020."  [Doc. 10-2 at 19].  Not until late 2020 did Plaintiff present "with sporadic complaints" of carpal tunnel.  [*Id.*].  Despite this relatively recent onset, the ALJ recognized that Plaintiff's carpal tunnel was a severe impairment, that it caused her to drop things, and that—while she has been informed that she will need surgery to treat her carpal tunnel—she is afraid to seek treatment in light of COVID-19 and potential complications.[6]  [*Id.* at 18].  Together with other severe impairments, Plaintiff's carpal tunnel was thus one ground for her RFC.  [*Id.* at 22].

Plaintiff argues that this discussion, and the ALJ's ultimate RFC determination, are based upon insufficiently substantial evidence.  She criticizes the ALJ for (1) failing to cite to specific medical records to support certain assertions, (2) for misstating evidence in the record, (3) for failing to discuss Social Security Ruling ("SSR") 85-15, and (4) for failing to perform a more detailed analysis of possible treatments available to Plaintiff.  [Doc. 16 at 20–21].  Plaintiff contends that these omissions cast doubt on her ability to frequently handle the controls of machinery, which would allegedly render her unemployable.  [*Id.* at 21].

Respectfully, none of these alleged failures are sufficient to establish that the ALJ's decision was not predicated upon substantial evidence.  First, "[i]t is unnecessary for the ALJ to

---

[6] The Court notes that Plaintiff testified that she is "going to get the surgery" for her carpal tunnel, but wants to wait to be vaccinated before doing so.  [Doc. 10-2 at 56].

cite to every piece of evidence as long as he considers all of the evidence." *Candelaria v. Apfel*, No. CIV 97-0367 BB/WWD, 1998 WL 36030887, at *4 (D.N.M. Mar. 6, 1988) (citing *Vincent v. Heckler*, 739 F.2d 1393, 1394–95 (9th Cir. 1984)).   And in any event, "isolated complaints" accurately describe the limited number of appearances of "carpal tunnel" in the entirety of Plaintiff's medical records—by this Court's count, approximately twelve.  [Doc. 10-8 at 987; Doc. 10-9 at 1019, 1021–22, 1063, 1067–68].

Second, Plaintiff's claim that the ALJ's review of the medical records was "incorrect"— and that she had complained of carpal tunnel "as early as November 2018"—is borne out by none of the records she cites.  *See* [Doc. 10-7 at 409–11, 423, 431, 818; Doc. 10-9 at 1063–64, 1076]. Some of these documents reference feelings of "numbness," but these references do not equate to a diagnosis of carpal tunnel.  And indeed, the only record that mentions carpal tunnel—[Doc. 10-9 at 1063]—is dated March 29, 2021, which is consistent with the ALJ's findings and inconsistent with Plaintiff's arguments.

Third, Plaintiff criticizes the ALJ for failing to discuss SSR 85-15, 1985 WL 56857 (Jan. 1, 1985) (the "Ruling").  She argues that the Ruling limits handling and fingering, and therefore precludes a "large number of occupations that a person could otherwise do."  [Doc. 16 at 19].  She claims that a discussion of the limitations outlined in SSR 85-15 "may" show that further limitations should be applied, or that a consultative examination regarding "fingering" may be necessary.  [Doc. 20 at 3].  But SSR 85-15 bears on solely nonexertional limitations, and specifically focuses on mental impairments.  *See generally* SSR 85-15, 1985 WL 56857 (Jan. 1, 1985); *see also Hall v. Colvin*, No. CIV-14-1425-HE, 2015 WL 13741886, at *3 (W.D. Okla. Nov. 16, 2015) ("SSR 85-15 explains the mental requirements of all unskilled work.").  To that end,

> SSR 85–15 is a policy statement that was adopted to emphasize that the potential job base for mentally ill claimants is oftentimes not large, and also to state that a

> finding of disability can be appropriate for an individual who has a severe mental impairment, even where he or she does not have adversities in age, education, or work experience.

*Roberts v. Astrue*, No. 12–cv–0827–WJM, 2013 WL 1729361, at *2 (D. Colo. Apr. 19, 2013). As such, it does not speak directly to Plaintiff's carpal tunnel or her ability to complete certain physical tasks. But, more fundamentally, SSR 85-15 does not compel a finding of disability; rather, it "was intended to clarify policies applicable in cases involving the evaluation of solely nonexertional impairments and to provide guidance on how an ALJ should consider nonexertional impairments within the context of the five-step process." *Id.* An "ALJ must make an individualized determination of the claimant's ability to work *based on her RFC* and the availability of jobs in the national economy." *Id.* (emphasis added). Here, the ALJ individually considered Plaintiff's carpal tunnel, her testimony, and her medical records and accordingly limited her to "light work" and to "occasionally crawl or climb ladders, ropes, or scaffolds as well as frequently handle, finger, feel, or operate hand controls with the bilateral upper extremities." [Doc. 10-2 at 22]. And because Plaintiff has not demonstrated "how [SSR 85-15] mandated a different result in this case," it is not a ground for remand.[7] *Roberts*, 2013 WL 1729361, at *3.

Fourth and finally, Plaintiff contends that the ALJ erred in failing to apply a four-part test outlined in *Frey v. Bowen*, 816 F.2d 508, 517 (10th Cir. 1987),[8] before making a determination

---

[7] The Court also notes that Plaintiff has presented no precedent—and the Court is independently aware of none—that would require the ALJ to explicitly mention SSR 85-15 in formulating his decision in this case.

[8] *Frey* provides that, "[i]n reviewing the impact of a claimant's failure to undertake treatment, . . . [the Court] consider[s] four elements: (1) whether the treatment at issue would restore claimant's ability to work; (2) whether the treatment was prescribed; (3) whether the treatment was refused; and, if so, (4) whether the refusal was without justifiable excuse." *Frey*, 816 F.2d at 517 (citing 20 C.F.R. § 404.1530).

regarding Plaintiff's credibility on the availability of treatments for carpal tunnel.[9]  [Doc. 16 at

21].  The only treatment discussed in the record appears to be surgery, which Plaintiff had not yet

received at the time of the hearing but appeared willing to undergo.  [Doc. 10-2 at 57 ("But as soon

as I can, I got to get my, my wrist fixed because I just drop things.")].  Regardless of whether *Frey*

actually mandates a four-factor test where an ALJ considers the extent of a claimant's attempts to

relieve her symptoms as a factor in a holistic credibility determination,[10] the ALJ simply did not

cite Plaintiff's failure to receive surgery to relieve her carpal tunnel in making a credibility

determination.  In fact, his reference to carpal tunnel and surgery neutrally reads: "[Plaintiff] has

been told that she needs surgery for her carpal tunnel, but she is afraid to get treatment due to

COVID and possible complications."  [Doc. 10-2 at 18].  He does not express any judgment as to

---

[9] In her Reply, Plaintiff appears to argue for the application of the *Frey* test *and*, for the first time,
SSR 16-3p.  Although the Court has no obligation to consider arguments first raised in a reply
brief, *see Martin K. Eby Const. Co. v. OneBeacon Ins. Co.*, 777 F.3d 1132, 1142 (10th Cir. 2015)
(reasoning that party waives issues and arguments raised first time in reply brief), the Court will
briefly note that SSR 16-3p only applies if certain conditions are met, including a finding by the
ALJ that the claimant "is entitled to disability benefits . . . regardless of whether the individual
followed the prescribed treatment." SSR 18-3p, 2018 WL 4945641, at *3 (Oct. 2, 2018); *see also
Autumn G. v. Kijakazi,* No. 20-1206-JWL, 2021 WL 3488394, at *5-6 (D. Kan. Aug. 9, 2021)
(holding SSR 18-3p does not apply where the ALJ found the plaintiff not disabled "even when
Plaintiff is not following prescribed treatment").

[10] The applicability of *Frey* to holistic credibility determinations remains somewhat unclear within
this Circuit.  *Compare Qualls v. Apfel*, 206 F.3d 1368, 1372–73 (10th Cir. 2000) (limiting *Frey*'s
reasoning to cases in which an ALJ denies benefits because a claimant has refused to follow a
prescribed treatment, and finding proper where ALJ based credibility determination on lack of
attempts to receive free and available medical care) *with Thompson*, 987 F.2d at 1490 (holding
that ALJs "should" consider the *Frey* elements before basing credibility determination on
noncompliance with treatment); *see also Holbrook v. Colvin,* 521 F. App'x 658, 663 (10th Cir.
2013) (citing *Qualls,* 206 F.3d at 1372) (holding that the *Frey* requirements "apply when such
noncompliance is cited as a stand-alone basis for denying benefits under 20 C.F.R. §§ 404.1530
and 416.930, not when it is merely part of a credibility assessment").  For the reasons set forth
above, the Court need not resolve this issue here.

either justification for avoiding surgery, and if anything appears to offer them to explain (rather than to cast doubt upon) Plaintiff's reasons for avoiding surgery.[11]

At bottom, this Court's role is not to reconstrue evidence related to carpal tunnel that is subject to more than one interpretation or to apply novel legal standards that do not bear on the facts of this case. Plaintiff implicitly concedes her argument would require as much, noting in passing that certain points are "not clear" and that consideration of other evidence "may" result in a different outcome. *E.g.* [Doc. 16 at 4; Doc. 20 at 6]. True, an ALJ is required to "consider[] all of the evidence." *Clifton v. Chater*, 79 F.3d 1007, 1009–10 (10th Cir. 1996). But, just as importantly, he or she "is not required to *discuss* every piece of evidence." *Id.* (emphasis added). Respectfully, the ALJ addressed Plaintiff's bilateral carpal tunnel diagnosis, weighed the medical evidence and hearing testimony, and reached a result supported by substantial evidence and the correct legal standards.

### III. Error in Evaluating Plaintiff's Mental Impairments at Step Five

Finally, Plaintiff argues that the ALJ erred in his evaluation of Plaintiff's mental impairments at Step Five.[12] [Doc. 16 at 22–25]. Plaintiff's argument generally centers on alleged omissions—rather than errors—in the ALJ's decision, though some are difficult to separate into

---

[11] To the extent Plaintiff is referring to the ALJ's note that "[t]he record does not show subsequent treatment" for an earlier diagnosis of "bilateral chronic mononeuropathies at both wrists," [Doc. 10-2 at 19], the same analysis applies. The ALJ does not tie Plaintiff's lack of treatment to any credibility determination that would arguably necessitate application of the *Frey* test; he is only expressing a fact borne out by the record, and one with which Plaintiff does not appear to disagree.
[12] The Court pauses to note that it is unclear whether Plaintiff is challenging the ALJ's RFC determination—that is, the assessment made between Steps Three and Four—or actually challenging his Step Five determination—that is, whether Plaintiff can perform work that exists in the national economy, considering her RFC, age, education, and work experience. Because Plaintiff does not make any express reference to the ALJ's RFC determination in this section—in contrast to extensive references to the RFC determination in her discussion of carpal tunnel—the Court construes this as a challenge to the ALJ's conclusion that Plaintiff can perform work in the national economy in light of her RFC, age, education, and experience.

distinct theories.  [*Id.*].  Nevertheless, the Court believes those purported omissions can be fairly divided into three categories: (1) a failure to consider SSR 85-15, (2) a failure to consider Plaintiff's testimony regarding her mental impairments, (3) a failure to consider the impact of Plaintiff's mental impairments upon her work history.  The Court addresses each issue in turn.

### A.    SSR 85-15

Plaintiff contends that the ALJ committed reversible error in failing to apply SSR 85-15 to his assessment of her mental impairments.  She argues that doing so would, *inter alia*, reveal a number of similarities between her own mental impairments and those listed in SSR 85-15, such as the loss of an ability to respond to supervision, coworkers, and usual work situations.  [Doc. 16 at 23].  In relevant part, SSR 85-15 provides that

> Where a person's only impairment is mental, is not of listing severity, but does prevent the person from meeting the mental demands of past relevant work and prevents the transferability of acquired work skills, the final consideration is whether the person can be expected to perform unskilled work. *The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting*. A substantial loss of ability to meet any of these basic work-related activities would severely limit the potential occupational base. This, in turn, would justify a finding of disability because even favorable age, education, or work experience will not offset such a severely limited occupational base.

*See* SSR 85–15, 1985 WL 56857, at *4 (Jan. 1, 1985) (emphasis added).  Plaintiff appears to claim that Plaintiff's work history demonstrates that she falls beneath this threshold, therefore justifying a finding of disability.

As an initial matter, the Court reiterates that the ALJ was not "required" to consider the text of SSR 85-15, as Plaintiff suggests.  [Doc. 16 at 24].  SSR 85-15—aptly named "Titles II and XVI: Capability to Do Other Work—The Medical-Vocational Rules as a Framework for Evaluation of *Solely* Nonexertional Impairments"—does not govern this case, where both

exertional and nonexertional impairments are at issue.[13]  *E.g. Roberts v. Shalala*, 66 F.3d 179, 183 (9th Cir. 1995) (reasoning claimant could not rely on SSR 85-15 when claiming both exertional and nonexertional impairments).  Nevertheless, the United States Court of Appeals for the Tenth Circuit has found SSR 85-15—though not binding—"useful for its discussion of the mental requirements for unskilled work" even in cases involving exertional work, and so the Court briefly applies its terms to this case for illustrative purposes.  *See Jaramillo v. Colvin*, 576 F. App'x 870, 877 n.6 (10th Cir. 2014).

Plaintiff begins by pointing to a number of examples from the record of her poor performance in the workplace.  She has been fired several times from different establishments for her failure to work well with supervisors (and five times from one establishment).  [Doc. 10-2 at 41, 48; Doc. 10-8 at 875].  Plaintiff also gestures at behavioral issues from outside the workplace, including an assault at a Walmart that led to her ban from the store and enrollment in anger management classes.  [Doc. 10-8 at 1013].

But in pointing to these issues and arguing that the ALJ failed to consider them, she fails to take into account the lengthy consideration afforded to her mental limitations throughout the ALJ's decision—lengthy consideration that matches well with the standards outlined in SSR 85-15.  First, the ALJ adopted a state agency psychological consultant's conclusion that Plaintiff "can do work requiring little judgment, simple tasks learned in one month; and she can accept supervision and can relate to coworkers and the general public if contact is not frequent or

---

[13] "Limitations are classified as exertional if they affect your ability to meet the strength demands of jobs," while "[l]imitations or restrictions which affect your ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." 20 C.F.R. § 416.969a.  Here, Plaintiff was limited to "a reduced range of light work," along with limitations on her ability to crawl, climb, and handle heavy items.  [Doc. 10-2 at 17].

prolonged." [Doc. 10-2 at 22]. He accordingly provided a number of limitations to her job duties, including limitations on the complexity of tasks, changes in routines, and duration of interactions with coworkers, supervisors, and the public. [*Id.* at 17–18]. He also took care to squarely address the very issues that Plaintiff alleges he failed to consider:

> There are statements in the claimant's records that indicate her work history is significantly impacted by inability to manage her emotions (Ex. 5F/37; 6F/39). With respect to these statements, these are mere recitations of her subjective allegations as fact in support of conclusory and meaningless statements of "significant" impact vocationally with minimal, if any, vocational relevance and inconsistent with the actual documented function overall. Further, they do not provide any function-by-function analysis, provide no vocationally relevant limitations, and have no probative value in assessing a function-by-function set of limitations. These "opinions" are, therefore, unpersuasive.

[*Id.* at 22].

Plaintiff's disagreement with that conclusion, or the conclusion of the state psychological consultant, is no grounds for this Court to disturb the ALJ's determination even if it were weighed against SSR 85-15's provision that "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85–15, 1985 WL 56857, at *4 (Jan. 1, 1985).

### B.    Plaintiff's Statements Regarding Work History

Plaintiff next takes issue with the purported inconsistency between her own statements about the intensity, persistence, and limiting effects of her symptoms and "the medical evidence and other evidence in the record." [Doc. 16 at 6]. As noted above, the ALJ considered these statements and simply concluded that they were less persuasive than the other record evidence.

As an initial matter, much of Plaintiff's hearing testimony supports the notion that her mental impairments do not render her disabled within the meaning of the Act.  The ALJ pointed out that her panic attacks had decreased to five or six times per year, that she shared chores with her roommate, that she drove vehicles, went shopping, visited her daughter, and babysat her granddaughter.  [Doc. 10-12 at 15–18].  She reported being able to pay bills and count change, groom herself regularly, and claimed that she felt well overall.  [*Id.*].  She exercised regularly, cared for her dogs, and completed household tasks on time.  [*Id.*].  Plaintiff herself reported that "she was thinking about getting a job and she was going to try to get a job."  [*Id.* at 19].

Medical records tell a similar story with regard to mental health.  The ALJ noted that Plaintiff had no recurrent psychiatric hospitalizations, and she appeared generally negative for psychiatric symptoms throughout 2019, 2020, and 2021.  [*Id.* at 19–21].  He did, of course, detail mood swings, stress, and an isolated instance of suicidal ideation, as well as occasional complaints of depression and panic attacks when appearing in public.  [*Id.*].  On the whole, however, this picture led the ALJ to conclude that Plaintiff "generally presented with stable complaints that appeared generally controlled with medication management."  [*Id.* at 19].

As such, the ALJ's Step Five conclusions are quite consistent with the severity of the limitations expressed by Plaintiff in her testimony and in her medical records.  There is no indication that, had the ALJ fully credited Plaintiff's testimony with regards to the intensity, persistence, and limiting effects of her symptoms, he would have arrived at a different Step Five conclusion or found that Plaintiff could not work in jobs consistent with appropriate limitations; indeed, it is unclear to the Court precisely what testimony Plaintiff believes should have been afforded more weight.  To be sure, she does not present a universally positive view of her mental health; she notes that she does not like being around people, that she is anxious, and that she is

overwhelmed easily.  [*Id.* at 39–41].  She also reported difficulties getting along with coworkers, to the point where she has come close to physically fighting them.  [*Id.* at 49].  But the fact that the ALJ evidently weighed her own positive testimony against her own negative testimony— coupled with the medical records—in reaching his Step Five conclusion does not warrant reversal.

### C.    Medical Evidence of Impact on Work History

Plaintiff also appears to criticize the ALJ for failing to consider the opinion of Mr. Low, a treating nurse practitioner.  [Doc. 16 at 24; Doc. 20 at 9].  Mr. Low expressed an opinion that Plaintiff's work history "has been significantly impacted by her inability to manage her emotions" because "she has gotten herself fired from multiple occupations."  [Doc. 20 at 9; Doc. 10-8 at 875]. As noted above, that is not accurate; the ALJ singled out this portion of Mr. Low's narrative and described why he found it unpersuasive:

> There are statements in the claimant's records that indicate her work history is significantly impacted by inability to manage her emotions (Ex. 5F/37; 6F/39). With respect to these statements, these are mere recitations of her subjective allegations as fact in support of conclusory and meaningless statements of "significant" impact vocationally with minimal, if any, vocational relevance and inconsistent with the actual documented function overall. Further, they do not provide any function-by-function analysis, provide no vocationally relevant limitations, and have no probative value in assessing a function-by-function set of limitations. These "opinions" are, therefore, unpersuasive.

[Doc. 10-2 at 22].  Put differently, the ALJ concluded that the statements were irrelevant to a vocational analysis and inconsistent with other medical evidence.  And, in any event, Mr. Low's narrative is less a medical opinion than it is a recitation of Plaintiff's own statements.  When there is conflicting evidence, as there is in this case, an ALJ is "entitled to resolve any conflicts in the record."  *Haga v. Astrue,* 482 F.3d 1205, 1208 (10th Cir. 2007).  In resolving these conflicts, an ALJ is permitted to disregard or discredit a medical opinion that is contradicted by other evidence in the record.  *See Lopez v. Barnhart*, 183 F. App'x 825, 828 (10th Cir. 2006).  And in this case,

not a single medical source suggested greater limitations than those provided for by the ALJ in his opinion—including Mr. Low.

Taken together, Plaintiff's arguments over the ALJ's consideration of her mental impairments are aimed at the ALJ's decision-making, not the evidence used to make that decision. Yet the Court's role is not to review the ALJ's decision anew; it may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001). Rather, the Court must affirm the Commissioner's decision if the legal standards were applied correctly and there is substantial evidence supporting the ALJ's findings. *See Glenn v. Shalala*, 21 F.3d 983, 988 (10th Cir. 1994). Respectfully, the Court finds that those standards are satisfied here.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that:

(1)     The Commissioner's final decision is **AFFIRMED**.

DATED:  January 9, 2023                    BY THE COURT:

_____
Nina Y. Wang
United States District Judge